# IN THE SUPREME COURT OF IOWA

No. 13–1202

Filed March 4, 2016

**STATE OF IOWA,**

Appellee,

vs.

**TRENT D. SMITH,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Jeffrey L. Harris, Judge.

Defendant appeals from conviction for domestic abuse assault causing bodily injury. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and Jeremy Westendorf, Assistant County Attorney, for appellee.

**CADY, Chief Justice.**

In this appeal from a conviction for domestic abuse assault, we consider whether hearsay statements made to an emergency room nurse and doctor by a victim that identified the perpetrator of the attack were admissible under Iowa Rule of Evidence 5.803(4) as statements made for purposes of medical diagnosis or treatment. The court of appeals found the hearsay statements were properly admitted at the trial. On our review, we conclude there was insufficient foundation to admit the statements under rule 5.803(4). We affirm the decision of the court of appeals in part and vacate in part, reverse the decision of the district court, and remand for further proceedings.

## I. Background Facts and Proceedings.

On June 9, 2012, at 1:03 a.m., the Black Hawk county emergency call center received a 911 call from M.D. She gave her address and said, "Just get here, thank you, please!" A short time later, M.D.'s mother called the center on a nonemergency line. She told the phone operator that M.D. asked her to call the police to report that Trent Smith had threatened M.D. and that M.D. was afraid of him.

Two officers were dispatched to M.D.'s residence. They found M.D. sitting in a car outside the residence with her five-year-old daughter and a dog. The officers checked the residence for intruders and began their investigation by interviewing M.D.

M.D. told the officers she had been upstairs and after hearing a sound was "hit" by something when going downstairs in the dark to investigate. She also said she lost consciousness after she was kicked in the head. She told the officers she believed the assailant had entered her residence through a locked door. M.D. eventually identified her assailant as "Trent Daniel," whom dispatch officers later identified as Trent Smith.

M.D. said Smith did not live at her residence but had been abusing her for ten years. She mentioned one prior assault when Smith beat her after he was released from jail following an arrest for domestic abuse.

The officers took M.D. to the emergency room of a local hospital around 2:40 a.m. She was treated by a doctor and a nurse for her injuries. The doctor found M.D. to be "in a moderate amount of distress" and "extremely shaken up." The nurse asked M.D. to explain what had happened to her. M.D. responded that she was "assaulted by her baby's daddy around midnight." She told the nurse that she had been kicked in the head and right arm, and she felt that her front teeth were loose. The nurse also pursued several standard screening questions at some point during the evening. Three questions pertained to domestic abuse. In response to these questions, M.D. indicated she did "feel afraid of/threatened by someone close to me." She also responded she had "been hurt by someone." She further agreed that "someone is taking advantage of [her]."

In response to an inquiry by the doctor about how she sustained her injuries, M.D. said she had been assaulted by her child's father. However, the doctor did not make any domestic abuse diagnosis or render any treatment for emotional or psychological injuries based on the identity of the perpetrator. The identity of the assailant or the effects of domestic abuse were not mentioned as a part of any treatment or diagnosis. The treatment consisted of radiology testing and other medical care to those areas of the body that had sustained physical injury. The diagnosis by the doctor pertained solely to the physical injuries sustained by M.D. It was limited to a closed head injury, cervical strain, facial contusion, and arm contusions.

M.D. was released from the hospital around 5 a.m. She was prescribed pain and antianxiety medications. The officers took her to the law enforcement center to obtain a written statement. An officer wrote a statement based on M.D.'s statements earlier in the night, but M.D. refused to acknowledge it with her signature.

Smith was subsequently charged with domestic abuse assault with intent to cause serious injury and domestic abuse assault causing bodily injury, both in violation of Iowa Code section 708.2A(2) (2011). At a pretrial hearing, the State informed the district court that M.D. intended to recant her statements identifying Smith as her assailant. The State further informed the court it intended to prove Smith was the assailant through the statements made by M.D. to the officers and medical personnel. In particular, the State indicated they would offer M.D.'s statements of identification made to the emergency room nurse and doctor under the medical treatment and diagnosis exception to the rule against hearsay. In response, Smith claimed the statements were not part of any medical diagnosis or treatment. The district court ultimately determined the identification statements were admissible at trial under the medical treatment and diagnosis exception to the rule against hearsay. It also determined M.D.'s statements to police were admissible at trial under the excited-utterance exception to the rule against hearsay. The State never argued the statements to the nurse and doctor were also admissible as excited utterances, and the district court did not rely on the excited-utterance exception in admitting them.

The case proceeded to trial. Law enforcement officers and medical personnel at the hospital testified at trial for the State, as well as a domestic abuse expert. The officers and medical providers recalled the statements M.D. made to them the night of the incident that identified

Smith as her assailant. There was no testimony that M.D. was told how the questions related to her treatment or diagnosis, and there was no testimony how they were used or needed by medical providers in her treatment or diagnosis. The domestic abuse expert explained the dynamics of domestic abuse, including the control exercised by the perpetrator. M.D. testified for Smith at trial. She said she was injured when she fell from a trampoline after drinking in excess.

The jury found Smith guilty of domestic abuse assault and domestic abuse assault causing bodily injury. Following sentencing, Smith appealed. He claimed the district court erred in admitting the hearsay statements made to police and medical personnel. He also claimed the district court erred in failing to merge the two convictions for purposes of sentencing.

We transferred the case to the court of appeals. It found the district court erred by admitting M.D.'s statements to police as excited utterances. However, it found the district court did not err in admitting M.D.'s statements made to the nurse and doctor as statements for purposes of medical diagnosis or treatment. As a result, the court of appeals found Smith was not prejudiced by the admission of the hearsay statements to police. It merged the convictions and affirmed the judgment and sentence for domestic abuse assault causing bodily injury.

Smith sought, and we granted, further review. The primary claim asserted by Smith is the statements of identity made to the doctor and nurse were inadmissible under the medical treatment and diagnosis exception. The State did not seek further review from the decision by the court of appeals that the statements made to police were not admissible as excited utterances. Accordingly, that decision stands as the final determination on that issue. *See State v. Guerrero Cordero*, 861 N.W.2d

253, 258 (Iowa 2015) (addressing on further review only one of four issues raised on appeal).

## II. Scope of Review.

Although we normally review evidence-admission decisions by the district court for an abuse of discretion, we review hearsay claims for correction of errors at law. *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009). "[T]he question whether a particular statement constitutes hearsay presents a legal issue," leaving the trial court no discretion on whether to admit or deny admission of the statement. *State v. Dullard*, 668 N.W.2d 585, 589 (Iowa 2003).

With respect to the issue now raised on further review involving the district court's decision to admit at trial the statements of identity made to the medical providers, we recognize we may affirm a ruling on the admission of evidence by using a different rationale than relied on by the district court. *See DeVoss v. State*, 648 N.W.2d 56, 62 (Iowa 2002). However, the rule described in *DeVoss* is discretionary, and we must be careful not to exercise our discretion to decide an issue concerning the admissibility of evidence on an alternative ground when the parties have not had an opportunity to properly develop or challenge the foundation for the evidence.

## III. Admission of Statements Identifying Perpetrator.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Iowa R. Evid. 5.801(*c*). Hearsay is not admissible at trial subject to certain exceptions and exclusions. *See id.* r. 5.802.

The statements at issue in this case—third-party accounts of identification statements made by M.D.—are hearsay. The question is

whether they are admissible under an exception to the rule against hearsay.

The general rationale for the rule against hearsay is that out-of-court statements are inherently unreliable because false perception, memory, or narration of the declarant cannot be addressed through the admission of an oath or exposed through cross-examination of the declarant. *See* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 802.02[3], at 802-6 to -7 (Mark S. Brodin 2d ed. 2015) [hereinafter Weinstein]. Thus, the exceptions to the rule against hearsay generally overcome this rationale through the identification of circumstances surrounding the issuance of the statement that demonstrate its reliability and necessity. *See id.* § 802.03[3] [a], at 802-8.

One exception to the rule against hearsay relates to statements made for the purposes of medical diagnosis and treatment. Iowa R. Evid. 5.803(4). This exception applies to

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

*Id.* The rationale for the exception is that statements made by a patient to a doctor for purposes of medical diagnosis or treatment are "likely to be reliable because the patient has a selfish motive to be truthful." Weinstein § 803.06[1], at 803-41 to -42; *see* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.803:4, at 951–52 (2015–2016 ed. 2015) [hereinafter Doré]. This motive exists because the effectiveness of the medical treatment rests on the accuracy of the information imparted to the doctor. Weinstein § 803.06[1], at 803-41 to -42. A patient

understands that a false statement in a diagnostic context could result in misdiagnosis. *State v. Tornquist*, 600 N.W.2d 301, 304 (Iowa 1999), *overruled on other grounds by State v. DeCamp*, 622 N.W.2d 290 (Iowa 2001). Thus, the circumstances of statements made for diagnosis and treatment provide "special guarantees of credibility" and justify the exception to the rule against hearsay. *State v. Hildreth*, 582 N.W.2d 167, 169 (Iowa 1998).

The medical diagnosis or treatment exception imposes two requirements. First, the exception applies to statements "made for purposes of medical diagnosis or treatment." Iowa R. Evid. 5.803(4). Second, the statements must describe "medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." *Id.* Thus, the first requirement is directed at the purpose and motive of the statement, and the second requirement is directed at the content or description of the statement. Yet as to both requirements, the statements must also "be reasonably pertinent to diagnosis or treatment." Doré § 5.803:4, at 952. These requirements track with the two-part test we adopted in *State v. Tracy* for establishing the admission of hearsay statements identifying a child abuser under the exception for medical diagnosis and treatment. 482 N.W.2d 675, 681 (Iowa 1992) ("[F]irst[,] the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." (quoting *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985))).

The fighting issue in this case is whether the portion of the statement made to a doctor or nurse that identifies the person who

caused or was the source of the injury is reasonably pertinent to diagnosis or treatment. This is a question that can be vexing for judges and lawyers. Normally, the identity of the perpetrator of physical injuries is not understood to be necessary information for effective medical treatment. *United States v. Joe*, 8 F.3d 1488, 1494 (10th Cir. 1993). Thus, these statements generally lack the inherent reliability of statements by patients to doctors for medical diagnosis or treatment. *Colvard v. Commonwealth*, 309 S.W.3d 239, 245–46 (Ky. 2010) (finding no inherent trustworthiness in identification statement not arising from a desire for effective treatment). When the identity of the perpetrator of an injury is not necessary information for effective medical treatment, a declarant could remain motivated to truthfully describe the cause of injuries while being motivated to suppress or twist the identity of the perpetrator towards their own ends. *See State v. Long*, 628 N.W.2d 440, 444 (Iowa 2001) (noting ulterior motives aside from treatment may affect statements of causation made to medical providers). In other words, self-motivation to be truthful that supports the admission of statements under the exception may be absent when the identity of the perpetrator is not necessary or pertinent to the medical diagnosis or treatment. *See id.* Accordingly, each assertion sought to be admitted that is contained within a broader statement made to medical providers must meet the requirements of the exception to be admissible.

We have identified some circumstances when statements that identify perpetrators are admissible under Iowa Rule of Evidence 5.803(4). One circumstance involves the identity of perpetrators of child abuse. *See Tracy*, 482 N.W.2d at 681–82. When the "alleged abuser is a member of the victim's immediate household, statements regarding the abuser's identity are reasonably relied on by a physician in treatment or

diagnosis." *Id.* at 681. The emotional and psychological injuries of such abuse are treated by the doctor along with the physical injury. *Id.* The doctor is also often concerned about the possibility of recurrent abuse. *Id.* In *Tracy*, the doctor followed a standard dialogue for purposes of diagnosis and treatment, and the victim understood that the doctor needed truthful responses to provide treatment. *Id.* This circumstance is key to admitting statements of identity. The circumstances need to show that the victim's statements are "not prompted by concerns extraneous to the patient's physical or emotional problem." *Hildreth*, 582 N.W.2d at 169–70.

The State argues that cases of domestic abuse fall within the same rule that commonly allows statements of the identity of perpetrators in cases of child abuse to be admitted. It argues the circumstances of this case fit within the reasoning behind the child-abuse exception because they do not show M.D. was motivated to be untruthful when she identified Smith as the assailant.

The State's overarching argument suggests that a categorical rule has emerged from rule 5.803(4) that admits statements of identity made to medical personnel by victims of child abuse and that should also apply to victims of domestic abuse. Yet, no such categorical rule for victims of child abuse has been recognized. While it is common for statements of identity made by victims of child abuse to be admitted under rule 5.803(4), the statements are not admitted simply because they fall within a category of statements made to doctors or medical personnel by victims of abuse. Instead, these statements are admitted only when there is evidence that the statements of identity were made by a child-abuse victim for purposes of diagnosis or treatment by a doctor or medical provider and the identity was pertinent to the diagnosis or

treatment.  *See State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014) ("The child must make the statements to a trained professional for the purposes of diagnosis or treatment to be admissible under rule 5.803(4)."); Doré § 5.803:4, at 957–58 & nn.22–23 (collecting cases and contrasting how courts apply the rule); *see also State v. Neitzel*, 801 N.W.2d 612, 621–22 (Iowa Ct. App. 2011) (discussing the steps taken by health care professionals to ensure truthfulness and the need to assess safety risks and the child's need for further counseling).  Eliciting the identity of a perpetrator of child abuse can be a normal aspect of medical treatment and diagnosis for child abuse victims; however, the value of that information is established by the foundational testimony of the doctors and medical providers in each case, and that testimony explains the pertinence of the perpetrator's identity to the diagnosis and treatment of the victim in the uinique circumstances of each case.  *See, e.g.*, *Hildreth*, 582 N.W.2d at 169–70 (setting foundation for social workers' diagnosis of child's emotional disturbance resulting from sexual abuse).  The need to establish foundation for the admission of evidence under rule 5.803(4) is compatible with the standard approach to the admission of evidence under most other rules of evidence.  In other words, proper foundation must normally be established before evidence may be admitted.  *See State v. Tompkins*, 859 N.W.2d 631, 639 (Iowa 2015) (requiring the State to lay a proper foundation before finding hearsay statements identifying a domestic abuse assailant and his actions admissible).  There is no rule that provides a categorical exception for victims of child abuse or domestic abuse.

The profound and serious problem of domestic abuse in this nation and this state does not escape us in our analysis of this case.  These problems are significant for victims of domestic abuse and the children

who have suffered by witnessing the abuse. The consequences to these victims and society as a whole are diverse and immense. These are problems and consequences this court has been addressing for decades. *See generally Final Report of the Supreme Court Task Force on Courts' and Communities' Response to Domestic Abuse* (1994) (compiling statistics on the incidence of domestic abuse in Iowa, identifying the courts' role, and formulating recommendations to address the problem from the judicial standpoint). We are also aware that the underlying dynamics of domestic abuse can create many obstacles in the criminal prosecution of perpetrators. *See* Laurie S. Kohn, *The Justice System and Domestic Violence: Engaging the Case but Divorcing the Victim*, 32 N.Y.U. Rev. L. & Soc. Change 191, 200–06 (2008) (discussing the influence of outside factors on victims' behavior both before and after reporting abuse and affecting their cooperation with the justice system). These complex dynamics can lead many victims to refrain from reporting abuse and then further lead to the recantation of statements of identity prior to trial. *See id.* at 203–05 (noting victims may ask to drop the criminal case, refuse to testify, recant, or downplay their risks); Jennifer L. Truman & Rachel E. Morgan, U.S. Dep't of Justice, *Nonfatal Domestic Violence, 2003–2012*, at 9 & tbl. 8, http://www.bjs.gov/content/pub/pdf/ndv0312.pdf (revealing only around fifty-five percent of domestic violence is reported to police). Nevertheless, our role in reviewing the admission of the hearsay statements at trial in this case is not to inject this policy into the analysis to create a new rule of evidence. Our authority to establish rules to govern the trial of a case exists independent of our authority to decide issues presented to us on appeal in cases. Today, we only address the issue of admission of statements of

identity through our existing rule of evidence. Our role is to interpret the rule as it is written and apply the hearsay exception as it exists.

Moreover, any categorical evidentiary rule must carefully consider the competing interests at stake. These interests include those found in the constitutional right of people accused of crimes to be confronted by their accusers. *See, e.g.*, *State v. Bentley*, 739 N.W.2d 296, 300–01 (Iowa 2007) (weighing accused's confrontation right against the interests of a child abuse victim). They are also found in the concept of fundamental fairness. *See* Iowa R. Evid. 5.102. The sheer complexity of domestic abuse would need to be considered, including both the interests of the victim and the rights of the accused. It has been observed that "there is neither a 'typical' victim of domestic violence, nor 'typical' responses, nor 'typical' circumstances in which such violence occurs." Jane C. Murphy & Robert Rubinson, *Domestic Violence and Mediation: Responding to the Challenges of Crafting Effective Screens*, 39 Fam. L.Q. 53, 58 (2005) (footnotes omitted). Thus, any categorical rule cannot be adopted that would "ignore[] variables such as the seriousness of the assault, the frequency of the abuse against the victim, the type of domestic relationship, or the presence or absence of emotional or psychological harm." *State v. Robinson*, 718 N.W.2d 400, 407 (Minn. 2006) (refusing to adopt a categorical exception to rule 803(4) in domestic violence cases).

We understand how the identity of an abuser could be pertinent to the treatment of a domestic abuse victim by a doctor. Domestic abuse victims suffer from far more than physical injuries. Emotional and psychological injuries are also inflicted with an assault, and it is understandable how the depth and breadth of those injuries would vary depending on the identity of the abuser. As a result, we see how complete medical treatment could normally include information on the

identity of the abuser. Yet, until a categorical rule exists, this understanding must be supplied from the testimony of doctors in the form of foundation pursuant to the broad rule providing for the admission of hearsay statements for all types of medical treatment. *See Joe*, 8 F.3d at 1494 & n.6 (citing to doctor testimony that established foundation despite finding there is general need for identity knowledge in domestic abuse cases).

In this light, we reject the argument by the State that statements of identity by victims of domestic abuse should be categorically admissible because such statements are now commonly admitted in cases of child abuse. Instead, we hold that in each case, the trial court must, as with other statements made during medical diagnosis and treatment, apply the test we adopted in *Tracy* to determine whether the statements made in that case should fall within this exception to the hearsay rule.[1] 482 N.W.2d at 681. The State, as the proponent of the evidence, has the burden to show the statements fit within rule 5.803(4).[2] *Long*, 628 N.W.2d at 443.

---

[1]Several other courts also examine whether criteria similar to our *Tracy* test have been met before admitting identity statements. *E.g.*, *United States v. Bercier*, 506 F.3d 625, 632 (8th Cir. 2007) (requiring foundation that the statements were essential to diagnosis and treatment in domestic sexual abuse case); *Robinson*, 718 N.W.2d at 407 (holding domestic abuse victim's identification of her assailant inadmissible without sufficient evidentiary foundation establishing the identity was reasonably pertinent to diagnosis or treatment); *State v. Moen*, 786 P.2d 111, 118–21 (Or. 1990) (en banc) (examining prior statements made concerning domestic abuse causing victim's depression to determine whether they met the foundational criteria of pertinence to medical diagnosis in murder case); *Oldman v. State*, 998 P.2d 957, 961–62 (Wyo. 2000) (utilizing the *Renville* criteria to determine the identity in a domestic abuse case was pertinent for treating bite marks for infectious condition).

[2]We recognize that statements made to emergency personnel in order to obtain medical treatment can also fall within the excited-utterance exception to the hearsay rule. Iowa R. Evid. 5.803(2); *State v. Harper*, 770 N.W.2d 316, 319–20 (Iowa 2009) (finding no need to determine if the statements would fall within rule 5.803(4) by holding other exceptions applied). However, the State made no claim in the district court or its appeal that the excited-utterance rule should apply.

The foundation required to admit a statement identifying a perpetrator of domestic abuse under rule 5.803(4) need not be elaborate. It establishes why the identity of the assailant is important in a domestic abuse case, as opposed to stranger assault, and what effect that identity has on diagnosis or treatment. It recognizes there is a difference between the need to know the cause or external source of the injuries—i.e., "what happened"—and the need to know the identity of the person causing the injuries. *See United States v. Iron Shell*, 633 F.2d 77, 84 (8th Cir. 1980) ("It is important to note that the statements concern what happened rather than who assaulted her. The former in most cases is pertinent to diagnosis and treatment while the latter would seldom, if ever, be sufficiently related.").[3] It requires evidence that the identity of the perpetrator was reasonably pertinent to medical treatment or diagnosis. We now turn to the evidence in this case.

The trial record in this case shows the nurse and the doctor only asked M.D. how she was injured, and their treatment efforts that followed only focused on the physical trauma to her head, arm, and hand. The nurse also asked three questions pertaining to domestic abuse in general pursuant to a broader screening protocol. However, the State offered no evidence that the protocol questions prompted any treatment of M.D. for her emotional or psychological response to the injuries or were asked in order to make a diagnosis relating specifically to domestic assault over other types of assault. In other words, the foundational evidence relating to her statements only pertained to the

---

[3]The United States Court of Appeals for the Eighth Circuit found five years later that a child-abuse victim who lived in the same household with the abuser was sufficiently different to fall within the narrow seldom-sufficiently-related category left open by *Iron Shell*. *Renville*, 779 F.2d at 436.

treatment she received for her physical injuries, not treatment she might have needed for her emotional, psychological, or other injuries as a result of the domestic violence.

M.D. was prescribed antianxiety medication prior to her discharge, but there was no evidence that the medication pertained to treatment of domestic abuse rather than the same anxiety as might be felt in a stranger-assault situation. It would be pure speculation to conclude the antianxiety medication related to the identity of the perpetrator. The rule requires that the connection between the statement and the treatment be "reasonable." Iowa R. Evid. 5.803(4).

Importantly, there was no evidence to suggest M.D. believed the identity of the perpetrator was reasonably pertinent to her treatment or diagnosis. There was no evidence the nurse or doctor told M.D. the identity of the perpetrator was important to the treatment or diagnosis of her injuries. There was no evidence the nurse or doctor used the identity of the perpetrator to treat or diagnosis M.D.'s injuries. In fact, there was nothing from the circumstances at the hospital to reasonably indicate M.D.'s treatment or diagnosis would have been different if she had not mentioned the identity of her perpetrator in describing how she was injured.

In short, the State presented insufficient evidence that the identity of the assailant was reasonably pertinent to M.D.'s diagnosis or treatment. Consequently, the circumstances mandated by the exception to show M.D. was self-motivated to truthfully describe her assailant were not established. Without this foundation, the trial court erred in admitting the portion of the statement that identified Smith as the assailant.

We acknowledge that the general circumstances presented at trial do not suggest a motivation by M.D. to be untruthful in her identification of Smith as her assailant to the emergency room nurse and doctor. Her statements of identity were not prompted by any cues asking for the identity of the perpetrator, and she only conveyed Smith's identity as part of the description of how she was injured.[4] Yet the exception does not seek to use the absence of a motive to be untruthful, but it requires evidence of a specific motivation to be truthful derived from its rationale. We are required to follow rule 5.803(4) as it is written.

This conclusion does not mean the identity of a perpetrator of domestic abuse can never be admitted into evidence under rule 5.803(4). It only means that the State must introduce evidence to establish the necessary foundation regarding both the declarant's motive in making the statement and the pertinence of the identification in diagnosis or treatment. This foundation requires evidence that a statement of identity was made for the purpose of medical diagnosis or treatment and the identity was part of a medical history reasonably pertinent to diagnosis or treatment.

## IV. Conclusion.

We conclude the trial court committed legal error by admitting the hearsay statements of M.D. through the testimony of the emergency room nurse and doctor without sufficient foundation. This error resulted in prejudice and requires a new trial. To be fair to both parties, we decline to consider for the first time on appeal whether the evidence

---

[4]M.D. recanted not only the identity of an assailant, but even the existence of an assault causing her injuries when she testified in court. However, the treating nurse and physician both testified that M.D.'s injuries were consistent with the description of the assault that evening.

would have been admissible under another exception to the rule against hearsay. Accordingly, we reverse the judgment and sentence of the district court and remand for a new trial.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.**

All justices concur except Waterman, Mansfield, and Zager, JJ., who dissent.

**WATERMAN**, **Justice (dissenting).**

I respectfully dissent. I agree with the court of appeals that the district court properly allowed the emergency room physician and nurse to testify regarding the victim's identification of Smith, her ex-boyfriend and the father of her child, as her attacker. That information was elicited pursuant to the hospital's screening protocol to protect patients traumatized by suspected domestic abuse. As the medical community and many other courts have long recognized, identifying the abuser is a key component in treating the patient's mental and physical injuries and ensuring the patient's safety. The majority errs by holding the district court abused its discretion by admitting the testimony under Iowa Rule of Evidence 5.803(4) and misses the opportunity to adopt a categorical rule allowing medical treatment providers to testify regarding a patient's identification of an intimate partner as the assailant. In my view, our court adopted a categorical rule in child abuse cases, and the rationale easily extends to adult domestic abuse. I would join the parade of courts adopting a categorical rule. Our application of this rule of evidence should evolve in response to the growing understanding and body of medical literature on intimate-partner violence.

Moreover, even if I agreed with the majority that admission of this kind of evidence should occur only on a case-by-case basis, I would find the record here adequate to warrant its admission. The State in this case laid the requisite foundation for the admission of the evidence under rule 5.803(4). This case is emblematic of the recurring problem in domestic abuse cases—a victim who identifies the attacker while traumatized but then later, controlled by his or her abuser, changes his or her story or refuses to cooperate with the prosecution. I trust Iowa

juries to find the truth. In this case, the jury disbelieved the victim's trial testimony that her injuries resulted from falling off a trampoline and believed what she told her treating physician and nurse the night of her attack.

I would also affirm the district court ruling allowing the physician and nurse to testify as to the victim's identification of her assailant on an alternative ground the majority understandably declines to reach—the excited-utterance exception to the hearsay rule. The victim was still reeling from the assault when she spontaneously identified Smith at the hospital simply when asked what happened to her. We may affirm an evidentiary ruling on any valid alternative ground supported by the record. *See DeVoss v. State*, 648 N.W.2d 56, 62 (Iowa 2002). The State, however, did not raise that ground in district court or brief it on appeal, and the court of appeals did not reach it as to the emergency room personnel. The majority appropriately chooses to defer deciding the issue under these circumstances, and nothing in today's opinion precludes the State from relying on the excited-utterance exception in the second trial.

### I. Additional Facts.

The majority's recitation of the facts is truncated. To put the issues in better context, I will recapitulate what happened to M.D. When police officers responding to her 911 call arrived at her home at 1 a.m., M.D., age twenty-nine, was sitting in her car with her five-year-old daughter and dog. M.D. was crying, upset, tense, and scared, with visible injuries—a swelling in her arm and around one eye, and scratches on her shoulder and knees. She initially told police an intruder had jimmied the side door lock and attacked her. She said he called her a "dirty whore," punched her, knocked her to the floor, and kicked the

back of her head repeatedly. She told officers she had blacked out during the attack and thought her arm was broken. At first she claimed she did not know her assailant. The officers were skeptical because they had previously been summoned to M.D.'s home over an altercation with Trent Daniel Smith, the father of her child.[5] The police persisted in questioning M.D. and urged her to be honest with them. She indicated she was afraid of her attacker and told police, "[Y]ou guys can't protect me forever." She then said "Trent Daniel" attacked her. Under further questioning, M.D., who seemed scared, gave Smith's full name.

The police officers gave M.D. a ride to the emergency room at Allen Memorial Hospital for treatment. When she arrived, she was "extremely shaken up." Nurse Trisha Knipper asked M.D. what happened and wrote down that M.D. said she "was assaulted by her baby's daddy around midnight." Knipper, pursuant to the hospital's protocol, asked M.D. screening questions that are asked of every patient who presents with a traumatic injury. M.D. answered that "there was domestic violence going on," "she was afraid of or threatened by someone close to her," "she had been physically hurt by her baby's dad," and "she felt as if someone was taking advantage of her."

Approximately eleven minutes after being admitted to the emergency room, M.D. spoke with Dr. Robert Mott. Dr. Mott asked what happened, and she replied she "was assaulted by the father of her child." She said she was knocked to the ground and kicked in the head and face multiple times. Dr. Mott noted that she was in a lot of pain and her arm

---

[5]Smith was the father of M.D.'s daughter. M.D. and Smith also had a son together, but the son died.

was very tender. No bone fractures were found. M.D. was given antianxiety medication and discharged at 5 a.m.

At trial eleven months later, M.D. changed her story to claim her injuries resulted from falling off a trampoline. The jury heard the testimony of the emergency room nurse and physician and police that M.D. had identified Smith as her attacker. The jury convicted Smith of domestic abuse assault and domestic abuse causing bodily injury. The court of appeals affirmed his convictions, concluding the district court properly admitted the testimony of the emergency room physician and nurse under Iowa Rule of Evidence 5.803(4) and that it was harmless error to admit the police officer's testimony of M.D.'s identification of Smith under the excited-utterance exception, rule 5.803(2). I would affirm the decisions of the district court and court of appeals.

## II. The Medical Diagnosis and Treatment Exception.

The fighting issue is whether the patient's identification of her assailant is admissible under the hearsay exception for

> [s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

Iowa R. Evid. 5.803(4). In *State v. Tracy*, we adopted the *Renville* two-part test to establish the admissibility of statements under this exception:

> [F]irst[,] the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis.

482 N.W.2d 675, 681 (Iowa 1992) (quoting *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985)). In *Renville*, the United States Court of

Appeals for the Eighth Circuit applied that test to affirm a trial court ruling that admitted a treating physician's testimony regarding the child abuse victim's identification of her abuser during a medical examination. 779 F.2d at 438–39. As I show below, our decisions in child abuse cases reach the same conclusion and demonstrate that a domestic abuse victim's identification of his or her attacker is admissible under this test.

**A. M.D.'s Statement Was Reasonably Pertinent to Medical Diagnosis or Treatment.** The emergency room nurse, Knipper, testified that M.D., like every patient admitted into the emergency room, was asked screening questions under the hospital's standard protocol. These questions covered topics including domestic violence, suicide, and workplace injuries. M.D.'s responses indicated she had experienced domestic violence. Each response was noted in M.D.'s chart. Knipper testified that she is required to "document complaints and treatment and diagnoses" on a chart for every patient that enters the hospital. The chart is maintained as a reference "for continued care" or "for any other needs that come about." Knipper's testimony shows that the documented responses to these standardized questions are used by the medical community in crafting a treatment plan and diagnosing the patient. M.D. replied to the standard questions by identifying Smith. M.D.'s statement was responsive to the questions being asked, and that information can be useful for diagnosis or treatment.

Dr. Mott's testimony showed that he considers the patient's version of what happened to be highly relevant to treatment. Dr. Mott testified regarding how he approaches new patients in the emergency room:

> Q. And do you try to find out from the patient what had happened? A. Absolutely.
>
> Q. Is that necessary for treating the patient? A. That is key.

When M.D. entered the emergency room, Dr. Mott followed his protocol to determine how to proceed with treatment:

> Q. And did you speak with [M.D.] about what had happened? A. I did.
>
> Q. And what did she say occurred?
>
> MS. LAVERTY: Objection.
>
> THE COURT: Same ruling. Overruled.
>
> Q. You may answer. A. Okay. She said that she was assaulted by the father of her child, was pretty much the first thing that she told me.
>
> Q. And did she explain to you how she was assaulted? A. She stated that she was knocked to the ground. And then once she was on the ground, then she was kicked in the head and the face multiple times.

His medical testimony showed that M.D.'s explanation of why she came to the emergency room was key to determine a proper course of treatment. *See Vasconez v. Mills*, 651 N.W.2d 48, 56 (Iowa 2002) (noting a doctor "who is called to treat and actually treats the patient" may testify under the hearsay exception because there is an increased "probability that the patient will not falsify in statements made to his physician at a time when he is expecting and hoping to receive from him medical aid and benefit." (quoting *Devore v. Schaffer*, 245 Iowa 1017, 1021, 65 N.W.2d 553, 555 (1954))).

M.D. consistently identified Smith as her attacker to medical personnel that night. That she recanted nearly a year later at trial does not cast doubt on her motives when seeking treatment the night of her attack. *See* Douglas E. Beloof & Joel Shapiro, *Let the Truth Be Told: Proposed Hearsay Exceptions to Admit Domestic Violence Victims' Out of Court Statements as Substantive Evidence*, 11 Colum. J. Gender & L. 1, 3–4 (2002) (listing reasons why victims recant). The rate of recantation among domestic violence victims has been estimated between eighty and ninety percent. *Id.*; Lisa Marie De Sanctis, *Bridging the Gap Between the*

*Rules of Evidence and Justice for Victims of Domestic Violence*, 8 Yale J.L. & Feminism 359, 367 (1996); *see also People v. Brown*, 94 P.3d 574, 576 (Cal. 2004) (approving the use of expert testimony stating that "[a]bout 80 to 85 percent of victims 'actually recant at some point in the process'"); *State v. Dority*, 324 P.3d 1146, 1152 (Kan. Ct. App. 2014) (noting that a fact finder may use common knowledge that "victims of domestic violence often recant their initial statements to police" (quoting *State v. Coppage*, 124 P.3d 511, 515 (Kan. Ct. App. 2005))).

Dr. Mott and Knipper treated M.D. for her emotional or psychological response to the attack. She was prescribed antianxiety medication. The hospital's screening questions do not exist in a vacuum. The questions about domestic abuse are asked for a reason—to allow the treating physicians and nurses to understand what happened and properly conduct follow-up treatment as necessary. In any event, Rule 5.803(4) does not condition admissibility on a showing that the patient's statements given for medical treatment and diagnosis were actually used for treatment. *See State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) (holding medical diagnosis and treatment hearsay exception applies to child sex abuse cases because "the identity of the abuser is a matter that *may* assist in diagnosis or treatment of an emotional or psychological injury" (emphasis added)). The context in which the identification is made is what matters, not what the treating physician and nurse did with that information.

For these reasons, M.D.'s statements were admissible under the medical diagnosis and treatment hearsay exception.

**B. We Should Adopt a Categorical Rule.** A categorical rule would be a logical extension of our jurisprudence regarding this hearsay exception's application to child abuse cases. Our precedents recognize

that a statement to a treating physician by a child identifying his or her abuser is admissible under rule 5.803(4). *State v. Tornquist*, 600 N.W.2d 301, 306 (Iowa 1999) (holding a child's "responses in a dialogue initiated for purposes of diagnosis or treatment" for child abuse "may assist in diagnosis or treatment")*, overruled on other grounds by State v. DeCamp*, 622 N.W.2d 290, 293 (Iowa 2001); *Hildreth*, 582 N.W.2d at 170 ("[A]scertaining the identity of the [child's] abuser is a matter that may assist in diagnosis or treatment of an emotional or psychological injury."); *Tracy*, 482 N.W.2d at 682 ("Because of the nature of child sexual abuse, the only direct witnesses to the crime will often be the perpetrator and the victim. Consequently, much of the State's proof will necessarily have to be *admissible* hearsay statements made by the victim to relatives and medical personnel."); *see also Renville*, 779 F.2d at 436 ("Statements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment.").

In *Tracy*, we stressed that a child seeking medical treatment will generally lack an improper motive, and the identification of an abuser is reasonably pertinent to medical treatment. 482 N.W.2d at 681. In that case, a minor told her doctor during an examination that she had been sexually abused by her stepfather. *Id.* We concluded the first requirement is met when "the examining doctor emphasize[s] to the alleged victim the importance of truthful responses in providing treatment" and when the "child's motive in making the statements [is] consistent with a normal patient/doctor dialogue." *Id.*

> The second part of the *Renville* test for admissibility under rule 803(4) requires that the content of the statement be such as is reasonably relied on by a physician in treatment or diagnosis. *Where the alleged abuser is a member of the victim's immediate household, statements*

> *regarding the abuser's identity are reasonably relied on by a physician in treatment or diagnosis.* Since child abuse often involves more than physical injury, the physician must be attentive to treating the emotional and psychological injuries which accompany this offense. To adequately treat these emotional and psychological injuries, the physician will often times need to ascertain the identity of the abuser.

*Id.* at 681 (emphasis added) (citations omitted). The same reasoning applies to adult domestic abuse victims.

In *Hildreth*, A.E., a minor, made several comments that led her parents to suspect the child had been sexually abused by her babysitter's husband, Steven Hildreth. 582 N.W.2d at 168. A.E. was referred to a therapist, who interviewed A.E. about her recollections of the abuse and the identity of her abuser. *Id.* at 169. The trial court permitted the therapist to testify regarding A.E.'s identification of her abuser at trial. *Id.* In affirming the trial court ruling, we emphasized that "where a child's statements are made during a dialogue with a health care professional and are not prompted by concerns extraneous to the patient's physical or emotional problem, the first prong of the *Renville* test is satisfied." *Id.* at 170. We held the second requirement was satisfied because "ascertaining the identity of the abuser is a matter that may assist in diagnosis or treatment of an emotional or psychological injury." *Id.*

The justifications expressed in *Hildreth* and *Tracy* for a physician treating child abuse parallel a physician treating adult domestic abuse. Regarding the first prong, a domestic violence victim has no motive to lie to a doctor or nurse. The identification of the abuser is "consistent with a normal patient/doctor dialogue" because standard screening questions elicit this information. *See Tracy*, 482 N.W.2d at 681. The second requirement is met because, as with child abuse, doctors must be

attentive to treating the emotional and psychological injuries that accompany domestic violence.

The United States Court of Appeals for the Tenth Circuit recognized these similarities in *United States v. Joe* and explained why a categorical rule for adult domestic violence logically follows from child abuse jurisprudence:

> [T]he identity of the abuser is reasonably pertinent to treatment in virtually every domestic sexual assault case, even those not involving children. All victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser. The physician generally must know who the abuser was in order to render proper treatment because the physician's treatment will necessarily differ when the abuser is a member of the victim's family or household. In the domestic sexual abuse case, for example, the treating physician may recommend special therapy or counseling and instruct the victim to remove herself from the dangerous environment by leaving the home and seeking shelter elsewhere. In short, the domestic sexual abuser's identity is admissible under Rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes 'reasonably pertinent' to the victim's proper treatment.

8 F.3d 1488, 1494–95 (10th Cir. 1993) (footnote omitted). I agree.

We should adopt a categorical rule to allow healthcare providers to testify as to the adult domestic abuse victim's identification of an intimate partner as the assailant. The Louisiana Supreme Court recently surveyed current medical literature and practices to adopt a categorical rule that

> reflects the *current* integrated approach to the treatment of domestic violence cases in the medical community. *See* American Medical Association Policy Statement on Family and Intimate Partner Violence H–515.965 Chicago: AMA (2014) (advocating that physicians: (a) "Routinely inquire about the family violence histories of their patients *as this knowledge is essential for effective diagnosis and care;*" and (e) "Screen patients for psychiatric sequelae of violence and make appropriate referrals for these conditions upon identifying a history of family or other interpersonal

violence.") (emphasis added); *see also* U.S. Dep't of Health & Human Serv., Screening for Domestic Violence in Health Care Settings (August 2013), Office of the Assistant Secretary for Planning and Evaluation ("Screening and counseling for domestic violence was first institutionalized in 1992 when the Joint Commission on the Accreditation of Hospitals and Health Care Organizations (JCAHO) mandated that emergency departments develop written protocols for identifying and treating survivors of domestic violence in order to receive hospital accreditation (Joint Commission, 2009). Since then, many health associations have supported screening across health care specialties. The American Medical Association (AMA), American Congress of Obstetrician Gynecologists (ACOG), and the American Nurses Association (ANA) all recommend routine universal screening.").

*State v. Koederitz*, 166 So. 3d 981, 985–86 (La. 2015) (footnote omitted).

Mandatory screening procedures, such as the one used in the emergency room in this case, recognize the harsh reality that many people are repeatedly victimized by the same person during the domestic abuse cycle. Approximately two-thirds of people—65.5% of women and 66.2% of men—physically assaulted by an intimate partner are victimized multiple times by the same partner. *See* Patricia Tjanden & Nancy Thoennes, U.S. Dep't of Justice, *Extent, Nature, and Consequences of Intimate Partner Violence* 39 (2000). Domestic violence survivors are often caught in cycles of violence that may persist for years. The average female domestic violence survivor reported the domestic violence cycle involving an intimate partner lasted over 4.5 years, whereas the average male domestic survivor's cycle lasted 3.6 years. *Id.* at 39–40. In consideration of these sobering statistics, we should adopt a per se rule that the identification of the perpetrator of domestic violence is pertinent to medical diagnosis or treatment and admissible under rule 803(4).

Other jurisdictions have reached this conclusion and adopted a categorical rule. *See Joe*, 8 F.3d at 1494–95; *Moore v. City of Leeds*, 1 So. 3d 145, 150 (Ala. Crim. App. 2008) ("We believe that the rationale

employed by the [Alabama] Supreme Court in [*Ex parte C.L.Y.*, 928 So. 2d 1069 (Ala. 2005), announcing a categorical rule to admit a child–patient's identification of their abuser] would also apply to victims of domestic violence."); *Nash v. State*, 754 N.E.2d 1021, 1025 (Ind. Ct. App. 2001) ("[I]n cases such as the present one where injury occurs as the result of domestic violence, which may alter the course of diagnosis and treatment, trial courts may properly exercise their discretion in admitting statements regarding identity of the perpetrator."); *Koederitz*, 166 So. 3d at 985–86 ("[W]e see no principled basis for confining statements of fault under [the medical diagnosis and treatment exception] solely to cases involving domestic sexual assault, whether of adults or children, as opposed to other instances of physical assault and abuse taking place in a context that may be fairly described in terms of domestic violence."); *People v. Pham*, 987 N.Y.S.2d 687, 690–91 (App. Div. 2014) ("Details of the abuse, even including the perpetrator's identity, may be relevant to diagnosis and treatment when the assault occurs within a domestic violence relationship because the medical provider must consider the victim's safety when creating a discharge plan and gauging the patient's psychological needs."); *State v. Moen*, 786 P.2d 111, 121 (Or. 1990) (en banc) ("Admissibility of statements of the type challenged here[—i.e., a domestic abuse victim identifying her abuser—]is not limited to cases involving child abuse."); *State v. Bong*, No. 33000–1–III, 2015 WL 3819223, at * 5 (Wash. Ct. App. 2015) ("Although statements attributing fault are generally not relevant to diagnosis or treatment, this court has found statements attributing fault to an abuser in a domestic violence case are an exception because the identity of the abuser is pertinent and necessary to the victim's treatment."); *State v. Moses*, 119 P.3d 906, 911 (Wash. Ct. App. 2005) (same); *Oldman v. State*, 998 P.2d 957, 961 (Wyo.

2000) ("There is no logical reason for not applying [the sexual domestic abuse exception in *Joe*] to non-sexual, traumatic abuse within a family or household, since sexual abuse is simply a particular kind of physical abuse."); *Commonwealth v. O'Connor*, 6 N. Mar. I. 125, 129 (N. Mar. I. 2000) ("[I]n cases of domestic and child abuse . . . the identity of the abuser becomes 'reasonably pertinent to diagnosis or treatment[,'] and a statement identifying the abuser is admissible under the medical hearsay exception."). These decisions are persuasive and should be followed.

The majority concludes there are too many variables in domestic violence cases to adopt a categorical rule, relying on *State v. Robinson,* without mentioning the Minnesota Supreme Court in that decision expressly left open the possibility it would adopt a categorical rule for domestic abuse cases in the future. 718 N.W.2d 400, 407 (Minn. 2006) ("We do not foreclose the possibility that we might in the future adopt a properly limited categorical rule of admissibility under the medical exception to hearsay for statements of identification by victims of domestic violence.").

The majority also refers to "the constitutional right of people accused of crimes to be confronted by their accusers," citing for support *State v. Bentley.* 739 N.W.2d 296, 300–01 (Iowa 2007). *Bentley* is nothing like this case. There, the police investigating child abuse arranged a "forensic interview" of the ten-year-old victim who was told at the outset of her interview that "a police officer and a DHS representative were listening on the other side of the observation window." *Id.* at 300. When the child asked to halt the interview, her interrogator "specifically implored [the victim] to continue because 'it's just really important the police know about everything that happened.'" *Id.* The interrogator during breaks consulted with the police officer about additional

questions to ask. *Id.* By contrast, M.D. asked the police to take her to the emergency room for treatment, and the police had no involvement when Dr. Mott and nurse Knipper examined her.

The majority cites no case holding that a statement made to a treating physician or nurse in the emergency room is "testimonial" for purposes of the Confrontation Clause. By definition, a statement made for purposes of medical treatment or diagnosis is not testimonial, as the Louisiana Supreme Court observed: "The statements at issue in the present case are also non-testimonial for purposes of the Sixth Amendment Confrontation Clause because they were not 'procured [with a] *primary purpose* of creating an out-of-court substitute for trial testimony.'" *Koederitz,* 166 So. 3d at 986–87 (quoting *Michigan v. Bryant,* 562 U.S. 344, 358, 131 S. Ct. 1143, 1155, 179 L. Ed. 2d 93, 107 (2011) (emphasis added)); *see Bryant,* 562 U.S. at 358–59, 131 S. Ct. at 1155, 179 L. Ed. 2d at 107 ("In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant."); *White v. Illinois,* 502 U.S. 346, 356, 112 S. Ct. 736, 743, 116 L. Ed. 2d 848 (1992) ("[A] statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not think replicated by courtroom testimony."); *cf. Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 312 n.2, 129 S. Ct. 2527, 2533 n.2, 174 L. Ed. 2d 314 n.2 (2009) ("[M]edical reports created for treatment purposes . . . would not be testimonial under our decision today."); *Giles v. California,* 554 U.S. 353, 376, 128 S. Ct. 2678, 2692–93, 171 L. Ed. 2d 488 (2008) ("[O]nly *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse

and intimidation [by women in abusive relationships], and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules . . . .").  In any event, in this case, M.D., Dr. Mott, and nurse Knipper all testified live at trial subject to cross-examination.  The majority's reference to the Confrontation Clause is a red herring.

### III.  Excited-Utterance Exception.

Under the *DeVoss* rule, we may affirm an evidentiary ruling under any valid alternative ground supported in the record.  *See State v. Newell*, 710 N.W.2d 6, 23 (Iowa 2006) ("Although we base our decision on a different rationale, we find no reversible error in the trial court's ruling."); *DeVoss*, 648 N.W.2d at 62–63 (noting that evidentiary rulings are an exception to our error preservation requirements and the district court ruling will be upheld if sustainable on any ground).  In my view, M.D.'s statements to her doctor and nurse identifying Smith as her abuser were admissible under the excited-utterance exception.  Iowa R. Evid. 5.803(2).[6]

An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."  *Id.*  "[S]tatements made under the stress of excitement are less likely to involve deception than if made upon reflection or deliberation."  *State v. Harper*, 770 N.W.2d 316, 319 (Iowa 2009) (quoting *State v. Tejeda*, 677 N.W.2d 744, 753 (Iowa 2004)).  We

---

[6]When an alternative ground supports a ruling admitting evidence, the proponent should brief and argue the alternative ground on appeal.  Otherwise, our court may defer deciding the issue until a case in which we have the benefit of adversarial briefing.

consider five nonexclusive factors in determining whether a statement qualifies as an excited utterance:

> (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

*Id.* (quoting *State v. Atwood*, 602 N.W.2d 775, 782 (Iowa 1999)).

Our court considered a similar fact pattern in *Atwood*. Atwood was charged with vehicular homicide after killing two pedestrians. 602 N.W.2d at 777. Atwood's passenger, Chris Sivertsen, was hospitalized. *Id.* at 782. A police officer interviewed Sivertsen approximately two and one-half hours after the accident. *Id.* The officer spoke with Sivertsen for about four to six minutes. *Id.* The officer asked Sivertsen what happened, and Sivertsen responded the defendant "jerked the wheel—or steering wheel way too hard and I thought he was mad." *Id.* We held the statement was admissible. *Id.* at 783. We noted that Sivertsen had been through a very traumatic experience; "he had just been involved in a serious car accident and had apparently seen a child hit the windshield." *Id.* We did not find that the time-lapse or the officer's question brought the statement outside the excited-utterance exception. *Id.* at 782.[7]

---

[7]We have applied the excited-utterance exception after significantly longer time-lapses. *See State v. Galvan*, 297 N.W.2d 344, 347 (Iowa 1980) (holding the passage of two days "leaves [the evidence] close enough to the transaction so that the trial court could have believed any presumption of fabrication was excluded"); *State v. Stafford*, 237 Iowa 780, 785–87, 23 N.W.2d 832, 835–86 (1946) (holding statements made fourteen hours following the alleged crime satisfied "the test of spontaneity" and were "a natural expression of what had happened to [the victim]"). *But see Tejeda*, 677 N.W.2d at 754 (finding a thirty-minute time gap between the startling event and the statement "weigh[s] heavily against the [statement's] admission").

The circumstances surrounding M.D.'s statements show her statements to Knipper and Dr. Mott were excited utterances. M.D. was extremely upset from the time she called 911 through her emergency room visit. She was anxious, in pain, and separated from her daughter in the middle of the night. Against this backdrop, M.D. twice identified Smith as her abuser in response to the first question asked by the nurse and then to another asked by the doctor—"what happened?" The substance of M.D.'s statement was the very reason she was so upset— because she had been assaulted by her intimate partner, the father of her child. We have found the excited-utterance exception applies in similar circumstances. *See State v. Richards*, 809 N.W.2d 80, 95 (Iowa 2012) (holding domestic violence victim's statement to her daughter that the defendant had put a cane to her neck was an admissible excited utterance because the victim had just come down the stairs, she "was upset and crying," and her "neck was red").

Accordingly, I would affirm the district court's admission of those statements as excited utterances. I agree with the court of appeals that any error in allowing the police officer to testify about what M.D. told him was harmless error. For these reasons, I would affirm the judgment of the district court and decision of the court of appeals.

Mansfield and Zager, JJ., join this dissent.